IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>ROBERT ALAN KING,<br><br>        Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:11-CR-315-TC |

      Defendant Robert Alan King has been charged with possession of methamphetamine with intent to distribute, possession of a firearm in furtherance of a drug trafficking crime, and felon in possession of a firearm. He moves to suppress evidence seized during a West Valley Police Department officer's April 2011 late-night stop and warrantless search of Mr. King's car. Mr. King contends that the stop and search violated his constitutional rights because the officer did not have reasonable suspicion to pull him over and the officer lacked probable cause to search the car.

      The court holds that the investigatory stop and the subsequent search for drugs were valid under the Fourth Amendment. Accordingly, Mr. King's Motion to Suppress Evidence is DENIED.

# FINDINGS OF FACT[1]

At 12:30 a.m., on April 3, 2011, West Valley City Police Sergeant Steve O'Camb (who has over ten years of training and experience as a police officer) was patrolling a relatively remote area in West Valley City. The area he was patrolling contained a few industrial properties, empty fields, and an outdoor concert amphitheater that was not open that night. A heavy snow had begun to coat the ground.

Sergeant O'Camb was standing just outside his patrol car which was parked on the relatively deserted road of 6400 West (the road runs north-south).[2] About 1,000 feet to the north of where he was standing, a second road splits off to the east from 6400 West. That diagonal road is called 5955 West. At the junction, as seen from an aerial view of the area, the two roads form a "Y". (See Exs. 1-2.) Although it was dark outside and the snow was coming down hard, Sergeant O'Camb testified that he could see the stop sign at the junction, which was 1,000 feet away from where he was standing.

As Sergeant O'Camb was looking north, he saw the headlights of a car in the distance heading south on 6400 West toward him and the junction. He could not see any other cars or people in the area. At the junction, the car turned left and appeared to be driving down 5955 West. At that point, Sergeant O'Camb heard five or six gunshots in quick succession coming

---

[1]The facts are taken from the testimony and evidence admitted during the June 23, 2011 evidentiary hearing on Mr. King's motion to suppress. (See June 23, 2011 Tr. of Evidentiary Hr'g on Def's Mot. Suppress Evid. (Docket No. 23-1) ("Tr.").)

[2]The roads in the area are named according to numbers on a directional grid.

from the direction where he had just seen the car.³ He thought someone might be firing at him. He looked in the direction of the gunshots and saw a car driving north on 6400 West (he could see its red taillights).

Sergeant O'Camb climbed into his patrol car, reported gunshots to police dispatch, and requested assistance as he followed the car. He drove north on 6400 West with the patrol car's headlights turned off. As he reached the junction, he stopped and turned on his spotlight and flashlight for about five seconds to look for other people, cars, or car lights. He saw none. He also looked for discarded ammunition shells. Although he did not see any (the ground was covered with newly fallen snow), he did see one set of tire tracks in the fresh snow. The tracks were easily distinguishable because the car's tires had displaced the newly fallen snow to reveal the road's asphalt surface. The tracks were located in the same area where the southbound car had turned at the junction. Based on his observation of the car's headlights and taillights, Sergeant O'Camb concluded that the car making the tracks was initially heading south on 6400 West before it did a U-turn at the junction and began heading north on 6400 West.

Sergeant O'Camb eventually caught up with the car (the road was slick so traffic was moving slowly). He did not lose sight of the car from the time he began following it, and because he had not encountered any other traffic, he knew it was the same car he had seen at the junction where he believed a gun had been fired. The car was a Dodge Durango SUV. The SUV turned right at the first intersection—4700 South—and headed east. Then the SUV turned right

---

³Sergeant O'Camb was able to identify the sounds as gunshots because he has been exposed to the sound of gunfire many time times during his tenure as a police officer. (See Tr. at 11-12.)

(south) onto 5600 West. At this point, the first backup officer arrived in a patrol car. Sergeant O'Camb continued to follow the SUV while he waited for an additional backup officer. But then the SUV turned left into a residential neighborhood. Because Sergeant O'Camb did not want to confront the driver of the car in a residential area, he turned on his emergency lights. The SUV slowly came to a stop, but only after rolling for thirty seconds through the neighborhood. At this point, the additional backup officer had arrived. It was still snowing heavily.

Sergeant O'Camb and Officer Clegg walked up the passenger side of the SUV. Officer Halulic walked up to the driver's side of the SUV. The front seat passenger, Ms. Chandra Magera, was agitated and began yelling profanities at the officers. Her son (who was approximately sixteen years old) sat in the back seat. Mr. King was the driver of the SUV.

The officers ordered Mr. King, Ms. Chandra, and her son to roll down the tinted windows. Sergeant O'Camb noticed that the glove compartment was open. The officers smelled marijuana in the car. Sergeant O'Camb testified that "there was a least four [of] us that could smell [marijuana] bad in [the car]." (Tr. at 34; see also id. at 52.)

Ms. Magera, when asked, said she had heard gunshots but did not know where they came from. Officer Halulic (who did not testify) spoke with Mr. King. Both Ms. Magera and Mr. King, upon being asked, gave the officers identification (Ms. Magera did not have a picture ID). As Sergeant O'Camb checked for warrants, the status of the individuals' identification and driver's license, and their criminal histories, Officer Clegg watched the three individuals, who stayed in the SUV. They had been ordered to keep their hands visible at all times.

The computer search revealed that neither Ms. Magera nor Mr. King had a valid driver's license. In addition, the officers learned that a warrant had been issued for Mr. King's arrest.

Ms. Magera had a criminal history involving drugs, a stolen vehicle, and giving false information to a police officer. Mr. King also had a criminal history that included drug and gun charges. The SUV was registered to a person who lived in Heber City, which is located up mountainous Parley's Canyon many miles from West Valley City. The officers tried to contact the owner of the SUV but did not have success until long after the stop.

Because the officers smelled marijuana in the car and because both Mr. King and Ms. Magera had a criminal history involving drugs, the officers decided to search the car. They put the three individuals in patrol cars (to keep them warm) and began to search for contraband. Among other items, they found methamphetamine and a scale in the back seat of the SUV. But they delayed the search on site because the weather was so bad.

The officers impounded the car. First, the officers had to execute the warrant on Mr. King and arrest him, so he was not available to drive the SUV (plus he did not have a valid driver's license). And Ms. Magera did not have a valid driver's license so she could not legally drive the car. Because the car was registered to a resident of Heber, Utah, who could not be reached, the officers impounded the SUV to get it out of the snow storm and off the road. Second, the officers had discovered a gun wedged behind the already-open glove compartment. They did not want to remove the gun on site for safety reasons. That is, they were concerned that if the gun was loaded, it might fire when they tried to pull it out with their frozen hands. They took the SUV to a more controlled environment where their hands would be warm. Sergeant O'Camb testified that "the main reason for that is it was safer for us to remove a handgun out of the thing. I mean my fingers, I could barely feel the tips of them. I'm not going to pull a gun out and risk, you know, if it's loaded or if it could go off." (Tr. at 38.)

The West Valley City Police Department has a policy that if a car is impounded, the officers from the Department conduct an inventory of the car, which is a thorough search of the car and containers in it. (See Tr. at 32-33, 53.)

## CONCLUSIONS OF LAW

### The Officer Had Reasonable Suspicion to Stop the Car.

A police officer may, in appropriate circumstances, briefly stop a person (or the car that person is in) to investigate suspected criminal activity. Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (investigative detention supported when officer has reasonable articulable suspicion that criminal activity was "afoot") (citing Terry v. Ohio, 392 U.S. 1, 22, 30 (1968)). Such action is known as a Terry stop or investigative detention. An investigative detention is valid under the Fourth Amendment if the detention is (1) justified at its inception and (2) reasonably related in scope to the circumstances that justified the stop in the first place. United States v. DeJear, 552 F.3d 1196, 1200 (10th Cir. 2009).

A stop is justified at its inception if the officer has reasonable articulable suspicion that the person was committing or had just committed a crime. Id.; United States v. Henning, 906 F.2d 1392, 1395 (10th Cir. 1990). Here, Mr. King contends that the officer did not have reasonable suspicion to stop the SUV. The court disagrees.

"Reasonable suspicion is defined as [a] 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" United States v. Guerrero, 472 F.3d 784, 787 (10th Cir. 2007) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). The court must consider the totality of the circumstances to determine whether reasonable suspicion existed. United States v. Sokolow, 490 U.S. 1, 8 (1989). Moreover, the "level of suspicion required for

reasonable suspicion is 'considerably less' than proof by a preponderance of the evidence or that required for probable cause." United States v. Lopez, 518 F.3d 790, 799 (10th Cir. 2008) (quoting Sokolow, 490 U.S. at 7).

Sergeant O'Camb was investigating gunshots in the area. Logically, he determined that the lone car in the area from where he believed the gunshots came could have been the source of the gunfire. No other cars were around. He saw the car's headlights before he heard the shots and then he saw the car's taillights right after he heard the shots. The car then left the scene and he followed it. What he saw at the junction further supported his belief that the car was the source of the gunshots—only one set of tire tracks could be seen in the freshly fallen snow and the U-turn indicated by the tracks further supported his belief that the car whose lights he saw was the only one in the area at the time of the gun shots. And he never lost sight of the car after it left the junction.

The Tenth Circuit has held that reasonable suspicion existed in situations very similar to the one now before the court. In United States v. Henning, 906 F.2d 1392 (10th Cir. 1990), the court upheld the officers' initial investigatory stop. In Henning, the officers, who were investigating gang activity at approximately 2:00 a.m., heard a gunshot 300 to 400 yards away and moments later saw a Chevrolet Suburban emerge from the area where the officers suspected the shots had been fired. Id. at 1394. The Suburban made a very quick stop at the intersection, then drove away. Id. No other traffic was in the area. Id. The officers pursued the Suburban and pulled it over to investigate the gunshots. Id. The district court, whose decision was affirmed by the Tenth Circuit, found that reasonable suspicion justified the initial investigatory stop. Id. at 1396 ("Trained law enforcement officers could not reasonably be expected to simply

7

stand by and ignore the potential significance such a fact pattern presents, believing, as they did, that they themselves might have been the targets of the gunfire."). See also United States v. Hicks, 182 F.3d 933, 1999 WL 317531 at *2 (10th Cir. May 20, 1999) (finding initial stop justified when officer, at 2:00 a.m., heard gunshots and saw the defendant's car speed away from the location of the gunshots where no other traffic could be seen); United States v. Stokes, 2002 WL 31928488 at *3 (D. Kan. Dec. 30, 2002) (citing Henning as controlling authority, the court found that the initial stop was justified because the officer heard multiple gunshots at 1:00 a.m. in a high crime area, saw a Cadillac speeding away from the area where the shots had been fired, and saw no other traffic in the area).

Given the totality of the circumstances, Sergeant O'Camb's training and experience, and the relevant case law, the court holds that Sergeant O'Camb had reasonable suspicion to stop the SUV and investigate the source of the gunshots.

**The Officer Had Probable Cause to Search the Car Without a Warrant.**

Probable cause to search a car may arise during an investigatory stop even if the circumstances establishing probable cause are unrelated to the initial stop. United States v. West, 219 F.3d 1171, 1178 (10th Cir. 2000) (citing Colorado v. Bannister, 449 U.S. 1 (1980)); United States v. Ozbirn, 189 F.3d 1194, 1199 (10th Cir. 1999). Probable cause to search a car exists "if, under the 'totality of the circumstances' there is a 'fair probability' that the car contains contraband or evidence." United States v. Nielsen, 9 F.3d 1487, 1489-90 (10th Cir. 1993) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

The court finds that, under the totality of the circumstances, Sergeant O'Camb and his fellow officers had probable cause to search the SUV without a warrant. First, the officers

8

reasonably suspected that the shots fired had come from the SUV. Second, the car took thirty seconds to pull over in an area that was not congested or posed a physically difficult area to pull over. Thirty seconds was sufficiently lengthy that Sergeant O'Camb became concerned that the SUV was not going to pull over. Third, the officers smelled marijuana in the car as soon as the windows were rolled down. Fourth, the front seat passenger was agitated and belligerent from the very beginning and had no photo identification. Fifth, the criminal history of both adults in the car involved drugs and guns (the original reason for the stop). Although the individuals in the car said they heard the gun shots but denied having any knowledge about the gun shots, the remaining factors combined provided ample probable cause to believe the SUV contained contraband, especially illegal drugs. Because the officers had reasonable suspicion to stop the SUV, the fact that the focus of their search evolved primarily into a search for illegal drugs does not lessen the import of the situation observed by these trained officers. For the reasons set forth above, the court holds that the search was valid under the Fourth Amendment.

**The Evidence Inevitably Would Have Been Discovered.**

Even if the search was not supported by probable cause, the inevitable discovery exception to the exclusionary rule applies here. Under the inevitable discovery doctrine, evidence seized during an otherwise unlawful search is admissible if the government proves by a preponderance of the evidence that the evidence would have been inevitably discovered through independent lawful investigation. United States v. Souza, 223 F.3d 1197, 1202-03 (10th Cir. 2000). "In determining whether the government has met its burden of proof, we consider 'demonstrated historical facts,' not 'speculative elements.'" United States v. White, 326 F.3d 1135, 1138 (10th Cir. 2003) (quoting Nix v. Williams, 467 U.S. 431, 444 n.5 (1984)).

Here, neither adult had a valid driver's license and Mr. King had a warrant for his arrest. At a minimum, with an unavailable registered owner and no driver who could legally drive the SUV, the officers had to impound the car. Given the West Valley City Police Department's policy to conduct an inventory search of any impounded car, it was inevitable that the officers would have found the drugs, drug paraphernalia, and the gun. See United States v. Martinez, 512 F.3d 1268, 1274 (10th Cir. 2008) (holding that because no person in the car could produce a valid driver's license, the officer would have impounded the car and conducted an inventory search inevitably leading to the discovery of illegal drugs); United States v. Horn, 970 F.2d 728, 732 (10th Cir. 1992) (holding that driver traveling alone who was arrested under warrant for parole violation could not have driven the car, and so the car would have been impounded and subjected to an inventory search that inevitably would have lead to the discovery of weapons).

## ORDER

For the foregoing reasons, Defendant Robert King's Motion to Suppress Evidence (Docket No. 18) is DENIED.

DATED this 11th day of October, 2011.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge